IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AXIS INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) Case No. 15-cv-405 |
| | ) **ELECTRONICALLY FILED** |
| v. | ) |
| | ) |
| THE PNC FINANCIAL SERVICES GROUP, INC. ET AL, | ) |
| | ) |
| Defendants. | ) |

## OPINION

**Mark R. Hornak, United States District Judge**

AXIS Insurance Company brought this declaratory judgment action to determine whether it would ever be required to indemnify part of PNC Financial Services Group's liabilities from a separate underlying litigation. Sort of. More accurately, AXIS brought this declaratory judgment action to determine whether *five specific defenses* would absolve AXIS of any obligation to indemnify PNC for the litigation liabilities. What if those defenses failed? AXIS purports to "reserve the right to raise all other terms and conditions [of the insurance policies] as defenses to coverage for any claim." This attempt to hedge against a final, definitive decision determining AXIS's obligations pushes this case—already of questionable maturity for judicial resolution—clearly into the realm of unripeness. AXIS's request for a declaratory judgment is unripe and thus unready for determination by a United States District Court.

### I.   BACKGROUND

In December of 2008 AXIS issued a first-layer excess blended liability insurance policy to PNC. ECF No. 1 at 1–3, 5. Essentially, the AXIS policy provides up to $25,000,000 of insurance coverage after a different insurance policy—issued by Houston Casualty Company—is

1

exhausted.  ECF No. 1 at 5.  At issue in this case is whether AXIS will be required to pay any portion of its policy coverage to PNC.  AXIS says no, and that we should decide this right now; PNC says yes, but that we may not need to decide the issues in this case at all.  Underlying PNC's latter contention is the intersection of two related cases with the present action.

The first is the "Overdraft Litigation," or *The PNC Financial Services Group, Inc., et al. v. Houston Casualty Company, et al.*, No. 2:13-cv-00331-CB-MPK (W.D. Pa.), pending before the U.S. Court of Appeals for the Third Circuit at its Docket Nos. 15-1656, 15-1717.  In the Overdraft Litigation, PNC sought a declaratory judgment against AXIS and Houston Casualty Company seeking to recover litigation and settlement liabilities from a different underlying case.  The district court required AXIS to pay PNC approximately $13,000,000 from the policy coverage and both PNC and AXIS appealed that judgment to the Third Circuit.  The parties dispute what impact an appellate reversal would have on this case—PNC argues that a favorable ruling would allow it to recover the full policy value, which would exhaust coverage and thus moot the present case, ECF No. 24 at 7; AXIS argues that such a ruling would only result in a remand to the district court to sort out further defenses.  ECF No. 30 at 7.  But it suffices for present purposes to note that the Overdraft Litigation is still being litigated and may, at some point, moot the issues presented in this case.

The second intersecting case is the "NPS Litigation," or *Jo Ann Howard & Assocs., P.C. v. J. Douglas Cassity, et al., incl. PNC Bank, N.A.*, No. 09-1252 (E.D. Mo.).  The present declaratory judgment action seeks to determine whether AXIS must cover part of PNC's final liabilities from the NPS Litigation. ECF No. 1 at 13–14   In March of 2015, the jury in the NPS Litigation found PNC liable for over $390 million in compensatory and punitive damages.  However, the execution of that judgment has been stayed until the district court in Missouri rules

on a host of post-trial motions and the appeals process is completed. *See Jo Ann Howard & Associates, P.C. v. Cassity*, No. 4:09CV01252 ERW, 2015 WL 4478151, at *3 (E.D. Mo. July 21, 2015). Both parties acknowledge that these post-judgment and appellate remedies may ultimately preclude AXIS from having to pay any amount in connection with the NPS Litigation.[1] That is, the parties acknowledge that the NPS Litigation may be resolved in such a way as to make the resolution of the present case meaningless.

Procedurally, PNC has filed a Motion to Stay the proceedings here until these two intersecting cases are resolved. This Court thinks a different issue is in play and has so advised counsel twice—first in a telephone status conference, ECF No. 26, and then again at the oral argument on PNC's Motion to Stay. ECF No. 34. In AXIS's Complaint, it included the following "Reservation of Rights:"

> The HCC Policy and the AXIS Policy contain terms, conditions, and limitations on coverage that are relevant to the claim arising from the Underlying Action but that are not implicated by this declaratory judgment action. Nothing in this complaint should be construed as a waiver by AXIS of any coverage defenses under the HCC Policy or the AXIS Policy, and AXIS reserves the right to raise all other terms and conditions as defenses to coverage for any claim made under the AXIS Policy, including the claim arising from the Underlying Action, as appropriate.

ECF No. 1 at 19.[2] This Reservation of Rights clause, coupled with the contingent nature of any eventual liability arising, led the Court to conclude that the claim is potentially not ripe for judicial action, and the Court so advised counsel on the referenced occasions.

Each party addressed the ripeness of the action in their briefs, but did not focus the whole of their attention on this issue. Nonetheless, since ripeness affects a federal court's jurisdictional

---

[1]The Court expresses no judgment about the likelihood or merits of this result; merely that, as acknowledged by both AXIS and PNC, it is a not insignificant possibility.

[2] During both the status conference and at oral argument, counsel for AXIS advised the Court that it was not currently aware of any other coverage defenses. That said, AXIS has also stuck by its guns, and its "Reservation of Rights" remains in its Complaint in this case, and is therefore before the Court.

power to hear a case or controversy before it, this Court concludes that it must dismiss AXIS's claims without prejudice, rather than staying the case to await future developments. *See Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Engineers, Local Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009) ("The ripeness doctrine determines whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." (internal quotations omitted)); *Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 433 (3d Cir. 2003) ("[C]onsiderations of ripeness are sufficiently important that the court is required to raise the issue *sua sponte* even though the parties do not"). *See also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction, but, even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." (internal citations and quotations omitted)).

## II. DECLARATORY JUDGMENT RIPENESS

The Third Circuit's test for the ripeness in declaratory judgment actions comes from *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647-50 (3d Cir. 1990). To determine whether a declaratory judgment action is ripe, the court must analyze (1) the "adversity of the interest of the parties," (2) "the conclusiveness of the judicial judgment," and (3) the "practical help, or utility, of that judgment." *Id.* A defect in one or two of the categories may be sufficient to find that a declaratory judgment claim is not ripe for judicial action. *See PSA, LLC v. Gonzales*, 271 F. App'x 218, 220 (3d Cir. 2008) (holding that the case was not ripe where sufficient adversity was established but conclusiveness and utility were not); *Home Ins. Co. v. Perlberger*, 900 F. Supp. 768, 772 (E.D. Pa. 1995) (finding the utility prong for ripeness met, but

4

finding no need to determine the adversity prong, because "the 'conclusiveness' stage of the ripeness analysis is determinative").

A. Adversity

"For there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests." *Step-Saver*, 912 F.2d at 648. Relevant to this inquiry is the likelihood of the alleged harm arising. A plaintiff "need not suffer a *completed* harm to establish adversity of interest between the parties," but to protect against a feared future event, a plaintiff "must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Pittsburgh Mack*, 580 F.3d at 190 (citing *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412 (3d Cir.1992)). Indeed, it is necessary that this substantial threat of harm "remain 'real and immediate' throughout the course of the litigation." *Presbytery of N.J. of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1468 (3d Cir.1994) ("Thus, where intervening events remove the possibility of harm, the court must not address the now-speculative controversy.") As such, a "potential harm that is 'contingent' on a future event occurring will likely not satisfy this prong of the ripeness test." *Pittsburgh Mack*, 580 F.3d at 190.

Here, AXIS's alleged injury rests upon a number of contingencies—specific dispositions in the Overdraft Litigation and NPS Litigation that would give rise to AXIS's potential obligation to indemnify PNC. In *Step-Saver* the contingency was plain from the plaintiff's complaint: the request for relief was framed as an *if-then* statement, making it clear that the plaintiff had only asked the court to "declare defendants liable *if* another court" reached a certain result. *Step-Saver*, 912 F.2d at 648. AXIS's Complaint here is not worded as such a strict logical conditional, but the contingency is just as evident. AXIS's Complaint here asks this

Court to declare AXIS free from liability *if* the Overdraft Litigation and NPS Litigation are decided in a way that leaves AXIS on the hook for part of PNC's liability. *Contrast*, *Pittsburgh Mack*, 580 F.3d at 191–92 (finding sufficient adversity where a defendant refused to indemnify plaintiff for its liability because the liability "is not based on a contingency—it has already received correspondence [that it is liable for the amount for which indemnity was alleged].")

Other district courts in the Third Circuit have debated whether this type of contingency renders parties non-adverse and claims unripe. *See Evanston Ins. Co. v. Layne Thomas Builders, Inc.*, 635 F.Supp.2d. 348, 353 (D. Del 2009) ("As a general matter, courts refrain from adjudicating whether an insurer has duty to indemnify the insured until after the insured is found liable for damages in an underlying action."). For example, in *Invensys Inc. v. Am. Mfg. Corp.*, 2005 WL 600297, at *9 (E.D. Pa. Mar. 15, 2005) the court found adversity to be lacking where the result of an underlying (and yet unresolved) litigation would determine whether the defendant would be required to indemnify the plaintiff.

Likewise, in *Home Ins. Co. v. Perlberger*, 900 F. Supp. 768 (E.D. Pa. 1995) the court noted—but did not hold—that "the adversity of the parties' interests as to the duty to indemnify will not be complete until after the resolution of [the underlying litigation], when it would be clear whether" a claim for indemnity could be asserted. *Id*. at 773. *See also See Pennsylvania Am. Water Co. v. Trunov*, No. 1:CV-12-0545, 2013 WL 2317790, at *3 (M.D. Pa. May 28, 2013) (holding that adversity and conclusiveness were lacking where the declaratory relief sought was "contingent on the resolution of liability in the underlying state court action"); *Westport Ins. Corp. v. Howell*, 2005 WL 1124092, *1 (E.D.Pa. May 10, 2005) (holding adversity to be lacking where "there has been no judgment or settlement on the underlying claim").[3]

---

[3] In a number of other cases, courts have laid down firm proclamations to the effect that there is no adversity (and thus no ripe claim) when the underlying action fixing liability has not concluded. *See, e.g., Victoria Ins. Co. v.*

Of course, some other courts examining similar indemnity situations have found sufficient adversity before a final determination of liability in the underlying claim. For example, in *Legion Indem. Co. v. Carestate Ambulance, Inc.*, 152 F. Supp. 2d 707, 714 n.3 (E.D. Pa. 2001) the court concluded that a declaratory judgment action concerning the amount of indemnification on an underlying action *was* ripe because the request for declaratory relief was not contingent upon facts that needed to be determined in the underlying action. And the court explicitly distinguished *Perlberger* on this ground. Likewise, in *Home Ins. Co. v. Powell*, 1996 WL 269496, at *7 (E.D. Pa. May 20, 1996) *summarily aff'd*, 156 F.3d 1224 (3d Cir. 1998), the court (again distinguishing *Perlberger*) concluded that the parties were sufficiently adverse because "they have staked out opposing positions in the instant litigation, they have conflicting financial interests with regard to the issues before this Court, and a declaratory judgment here will likely have a significant effect on the settlement posture of the underlying litigation."

Though *Legion* and *Powell*—like the cases in the preceding analysis—are similar to the present case, this Court believes that the Overdraft Litigation and the NPS Litigation create ample antecedent contingencies, such that the parties are not sufficiently adverse to create a ripe action. More importantly, as noted below, even if the parties *were* sufficiently adverse, AXIS's claims lack the requisite conclusiveness and utility to warrant a ripe declaratory judgment action.

---

*Mincin Insulation Servs., Inc.*, 2009 WL 90644, at *6 (W.D. Pa. Jan. 14, 2009) ("Since there is not yet a judgment in the underlying action, there is not yet any adversity of interest with respect to [a] duty to indemnify"); *Hartford Fire Ins. Co. v. InterDigital Commc'ns Corp.*, 464 F. Supp. 2d 375, 378-79 (D. Del. 2006) ("As a general matter, courts refrain from adjudicating whether an insurer has a duty to indemnify the insured until after the insured is found liable for damages in the underlying action."); *Cincinnati Ins. Cos. v. Pestco, Inc*., 374 F. Supp. 2d 451, 464–465 (W.D. Pa. 2004) ("[A] court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying action."). In many of these cases, however, the insurer/indemnifier was also defending (or had a duty to defend) the opposing party in the underlying litigation. Therefore, declaring judgment on the indemnification issues could pervert the incentives of the insurer who would still have to defend the opposing party in the underlying litigation. Though these cases do not always highlight this incentive problem in their analysis, the distinction sufficiently distinguishes these cases from the present dispute. Still, the strong language used in these cases is informative. *See Victoria Ins.*, 2009 WL 90644, at *6; *Hartford Fire Ins.*, 464 F. Supp. 2d at 378-79; *Cincinnati Ins.*, 374 F.Supp.2d at 464–465.

B.  **Conclusiveness**

The second factor in the *Step-Saver* analysis scrutinizes how "conclusive" a judicial judgment would be in a requested declaratory judgment action. The "conclusiveness" prong examines two facets of a potential declaratory judgment. First, "whether the parties' rights will be definitively decided by a declaratory judgment." *Step-Saver*, 912 F.2d at 649 n.9. *See also Armstrong World*, 961 F.2d at 412 (this factor examines "the conclusivity that a declaratory judgment would have on the legal relationship between the parties."). Second, whether the case rests upon a sufficiently solid factual foundation. *See NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001). "Predominantly legal questions are generally amenable to a conclusive determination in a preenforcement context"; however, judgements that would be "based upon a hypothetical set of facts" stray towards the realm of advisory opinions and thus favor a finding of unripeness. *Pittsburgh Mack* 580 F.3d at 190–91 (citing *Presbytery of N.J.*, 40 F.3d at 1468).

Though this case is plainly based upon a "hypothetical set of facts"[4] the claims do raise predominantly legal inquiries.[5] AXIS asks this Court to examine five asserted defenses in order to determine whether, under the language of the insurance policies, certain underlying situations absolve it from any duty to indemnify.[6] But in fact, that is precisely the problem. AXIS's claims

---

[4] Namely: *Assuming* that PNC seeks indemnity for some or all of the liability arising from the NPS Litigation, do the pled defenses provide a proper defense against any such coverage?

[5] Of note, PNC implies that the claims are not predominantly legal. S*ee* ECF No. 31 at 11 (arguing that "[f]acts relevant to AXIS' claims—and PNC's defenses to those claims—remain to be decided").

[6] Specifically, AXIS asks the Court to determine: (1) Count I – whether the NPS Litigation involves the same subject matter as a number of cases listed in a 2012 Release agreement between PNC and AXIS; (2) Count II – whether the NPS Litigation involves "Wrongful Act(s)" (as that policy term would be interpreted) committed before or after PNC acquired a subsidiary company; (3) Count III – whether certain prior lawsuits and the NPS Litigation constitute a "single claim" under the AXIS policy, such that the claim may have been first made before the policy period; (4) Count IV – whether, under the terms of the policy, the NPS Litigation arises out of the same facts and circumstances as certain prior litigations; and (5) Count V – whether the AXIS Policy covers claims against a successor in interest, as PNC is claimed to be in the underlying litigation. ECF 1 at 14–19.

require resolution of five discrete, isolated, and—by AXIS's own admission—potentially inconclusive points of law. Then, by virtue of the Reservation of Rights clause, a final decision of this Court may well not "definitively [ ] decide the parties' rights." *NE Hub Partners*, 239 F.3d at 344.

Of course, if this Court found in AXIS's favor as the case is now pled, that might conclusively determine the parties rights; but *Step-Saver* counsels that a ripe declaratory judgment should *definitively* decide the parties rights. *See Step-Saver*, 912 F.2d at 649 n.9. Since AXIS purports to retain the "right to raise all other terms and conditions as defenses to coverage," the rights of the parties can only be conclusively determined now in one direction. That is to say, if AXIS's defenses take the day, the parties would know, conclusively, that AXIS need not indemnify PNC for any NPS Litigation liability; but if PNC prevails at this juncture, the parties' legal relationship still would not be settled. In the latter case, one would know that *these five defenses* do not absolve AXIS, but one would be unable to say whether any other coverage defense allows AXIS to avoid indemnification. Why? Because AXIS has affirmatively "reserved" its right to raise such a defense or defenses later on.

Consider again the contrast with *Pittsburgh Mack*. In *Pittsburgh Mack*, the court explained that the requested "declaratory judgment will be conclusive because it will establish whether the [defendant] is obligated to indemnify or hold harmless [the plaintiff]." *Pittsburgh Mack*, 580 F.3d at 192. As explained above, AXIS's Complaint cannot do the same. Instead, it can only conclusively establish whether AXIS is free from indemnifying PNC *under the five defenses now pled*. No conclusive judgment would (or could) be rendered with respect to the universe of potentially remaining defenses, and resolution of any such defenses would be subject to another whole round of litigation. *See Perlberger*, 900 F.Supp at 773 (finding a requested

9

declaratory judgment insufficiently conclusive and unripe where possible resolutions of the underlying litigation and the requested declaratory judgment would require additional rounds of litigation).

Finally, it is worth noting that *Step-Saver* also counseled against a finding of conclusiveness when a requested declaratory judgment is based upon a "contingency." *See Step-Saver*, 912 F.2d at 648 ("[E]ven if we issued the requested declaration, the legal status of the parties would not change (nor would it be clarified), because our declaration itself would be a contingency."). As noted above, district courts split on whether an undecided underlying litigation is, itself, a contingency that requires dismissal. *Compare Legion Indem. Co.* 152 F. Supp. 2d at 714 n.3 (finding the case ripe because the plaintiffs "requests for declaratory relief are not contingent upon facts that need to be determined in the underlying action" but rather "can be determined from the plain language" of the complaint and the insurance policy) *with Invensys Inc.*, 2005 WL 600297, at *8 (finding the case unripe where "the declaration Plaintiff seeks is based on the overriding contingency that liability in the underlying lawsuits will be imposed"). Still, taken together with AXIS's Reservation of Rights clause, this Court concludes that the requested declaratory judgment would be insufficiently conclusive to be properly considered "ripe."

### C. Utility

The final prong of the *Step-Saver* ripeness test assesses the "practical help, or utility" that the requested judgment would provide. This third step analyzes "whether the parties' plans of actions are likely to be affected by a declaratory judgment," *Step-Saver*, 912 F.2d at 649 n.9, and considers "the hardship to the parties of withholding judgment." *NE Hub Partners*, 239 F.3d at 344–45.

10

Of course, almost any judicial judgment affecting the rights of a party is useful, to some degree, as a form of risk reduction. That is, a reduction in future uncertainty. However, to render a requested declaratory judgment ripe—and to make the utility prong mean anything—the action must achieve more than that minimum. *See, e.g.*, *Invensys Inc.*, 2005 WL 600297, at *8 (holding that resolution of a declaratory judgment action about "would not be of significant practical help in ending the controversy between the parties," because the defendant "would continue to deny any duty to indemnify" under an alternative theory).

As such, this Court concludes that AXIS's requested declaratory judgment is of insufficient utility. First, as above, the utility of this action is limited by the fact that it could result in an inconclusive judgment. If the Court were to find in favor of AXIS, PNC's "future plans of action" would be affected to the extent that PNC would (presumably) not be able to pursue indemnification from AXIS.[7] From AXIS's standpoint, a definitive resolution of the risk associated with up to $25,000,000 in liability would likely have some effect on subsequent business decisions. However, if the Court were to find in favor of PNC now, the decision would be of minimal utility; PNC would continue to request indemnification from AXIS, and AXIS would seek to raise any additional coverage defenses against PNC. True, *some* uncertainty would be resolved, but for the most part, the parties would be "in no better position to determine what course of action to take . . . than they are now." *See Id.* at *8.

Second, the hardship to AXIS of withholding judgment now is not excessive. Again, withholding judgment (or rendering a judgment in this action against AXIS) would leave AXIS with the risk of a liability in the future, but bearing risk is what insurance companies do. AXIS will be in no worse position than it was when it entered into the insurance contracts in 2008. AXIS also asserts the burden of monitoring the NPS Litigation in order to determine whether it

---

[7] After the inevitable appeal, given that $25 million of coverage may be on the line.

should associate in PNC's defense of that case; however, the Court has no reason to believe that these monitoring costs are so arduous or burdensome that they would drag the case back into the realm of ripeness.

### III. DISCRETIONARY JURISDICTION

The Court believes that it does not have the power to hear this case because the claim is not ripe. However, even if the Court *could* hear the case, it concludes that it should not exercise its discretion to do so.

The Declaratory Judgment Act, 28 U.S.C. § 2201, states: "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* (emphasis added). As *Step-Saver* explained, there is a "considerable amount of discretion" built into the Declaratory Judgment Act. *Step-Saver*, 912 F.2d at 643. "Even when declaratory actions are ripe, the Act only gives a court the power to make a declaration regarding 'the rights and other legal relations of any interested party seeking such declaration,' 28 U.S.C. § 2201; it does not require that the court exercise that power." *Id.*

In *Reifer v. Westport Ins. Corp.*, 751 F.3d 129 (3d Cir. 2014), the Third Circuit set out eight factors that should guide the "sound and reasoned discretion" of a district court considering not to exercise jurisdiction over a declaratory judgment action: "(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; (4) the availability and relative convenience of other remedies; (5) a general policy of restraint when the same issues are pending in a state court; (6) avoidance of duplicative

litigation; (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion." *Id*. at 146.

Measuring the Reservation of Rights clause against these factors counsels against the exercise of discretion over this action. Considering factor (1), this action may not resolve the uncertainty of the obligation which gave rise to the controversy, because the uncertainty can only be resolved if the court finds in favor of AXIS's current defenses. As explained extensively above, ruling that AXIS's five pled defenses are unsuccessful would not resolve the indemnification question; the uncertainty surrounding the indemnification obligation would still remain. As to factor (2), it does not appear that either party would be materially inconvenienced. AXIS obviously wants the issues to be decided now (or else they wouldn't have filed the action and contested PNC's Motion to Stay) but this Court does not believe that AXIS would be unfairly or unduly prejudiced by either waiting until the liability becomes certain or bringing all of its possible defenses in one declaratory judgment action. The public interest is also a wash; it does not appear that the public would have much of any interest in the expedited resolution of these issues. Indeed, one might even argue that the exercise of judicial resources to reach a potentially inconclusive judgment in piecemeal litigation is *against* the public interest. *But see Westfield Ins. Co. v. Icon Legacy Custom Modular Homes & Icon Legacy*, No. 4:15-CV-00539, 2015 WL 4602262, at *3 (M.D. Pa. July 30, 2015) (finding "judicial economy" arguments not "terribly compelling"). Factor (4) weighs in favor of declining to exercise jurisdiction. AXIS could wait until the indemnification contingency is resolved or it could bring all of its coverage

13

claims and defenses in one action to conclusively determine the parties' relationship under the insurance contracts. While from AXIS's perspective it may be more convenient to take its shot with the coverage defenses it has now asserted and (if unsuccessful on these five defenses) come back for "Round Two" by asserting other "reserved" defenses, it is materially *inconvenient* for PNC to have to litigate (and re-litigate) on such terms. Factor (6) weighs against an exercise of jurisdiction as well. Though there is not a parallel pending state court proceeding here, the Reservation of Rights clause may raise duplicative *subsequent* litigation if AXIS chooses to try enforcing other defenses after the resolution of the present litigation.[8]

Still, this Court recognizes that *Reifer* placed emphasis on the existence of a pending parallel proceeding. Though the absence of such a proceeding does not *require* the exercise of jurisdiction, such an absence "militates significantly in favor of exercising jurisdiction." *Id.* at 144. Indeed, many of the district courts tasked with applying *Reifer* have proceeded to hear declaratory judgment actions when there is not a parallel pending state action *See, 1100 Adams St. Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, 2014 WL 5285466, at *4-5 (D.N.J. Oct. 15, 2014) report and recommendation adopted sub nom. *1100 Adams St. Condo. Ass'n, Inc. v. Tarragon Corp.*, 2014 WL 5762067 (D.N.J. Nov. 5, 2014) (claiming that *Reifer* instructs that "the issue of parallel state court proceedings is paramount in determining whether to exercise jurisdiction under the DJA"); *Nationwide Prop. & Cas. Ins. Co. v. Shearer*, 2015 WL 1186008, at *6 (W.D. Pa. Mar. 13, 2015); *BCB Bancorp. v. Progressive Cas. Ins. Co.*, 2014 WL 2434193, at *6 (D.N.J. May 28, 2014). As noted, there is no such parallel state proceeding here.

---

[8] It is rational for AXIS to bring this action in an effort to wipe the risk of its liability off of its balance sheet. Indeed, it is also rational for AXIS to—if allowed—attempt to hedge its chances of success by bringing its claims piecemeal. However, just because that approach may make good litigation sense for AXIS does not mean that it makes good judicial sense for this Court.

Nonetheless, this Court believers that the better course is to follow the lead of the court in *Cent. Transp., LLC v. Mainfreight, Inc.*, 2015 WL 620716, at *4 (E.D. Pa. Feb. 11, 2015) (holding "that the lack of a pending parallel state proceeding is far outweighed by the factors as analyzed above."). Because of the uncertainty surrounding (1) whether there will ever be a PNC liability AXIS is required to indemnify at all, and (2) the potential of future, similar litigation due to AXIS's Reservation of Rights clause, this Court does not believe that it should exercise any discretionary jurisdiction over the declaratory judgment claims in AXIS's Complaint.

### IV.  CONCLUSION

The contingent nature of any liability that PNC could assert against AXIS puts this case on uncertain jurisdictional footing. Adding AXIS's Reservation of Rights clause to the mix definitively tips that balance towards a lack of ripeness. The Article III and prudential requirements of ripeness, as defined by the Third Circuit's *Step-Saver* test, are not met here. Furthermore, even if the Court *could* properly hear this case, it would elect not to exercise its discretionary declaratory judgment jurisdiction. Therefore, this Court will dismiss AXIS's Complaint without prejudice.

An appropriate Order will issue.

s/ Mark R. Hornak  
Mark R. Hornak  
United States District Judge

Dated: September 29, 2015

cc: All counsel of record